IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TERRY JACKSON,

                Plaintiff,                      OPINION AND ORDER

    v.

                                            09-cv-254-wmc

RICK RAEMISCH, MATTHEW FRANK,
CHRIS ROELKE, ROBERT SPRINGBORN,
LORI SIMON, BETH LIND, JOE HALL,
BRENDA RILLING, FRANCIS PALIEKARA,
RICK GEIGER, MICHAEL THURMER,
SANDRA HAUTAMAKI, RANDALL GERRITSON,
JUNE KATHY MEIER and SHAWN MATHWHICH,

                Defendants.[1]

---

In this prisoner civil rights case brought under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1, plaintiff Terry Jackson is proceeding pro se on the following claims:

> (1) defendants Chris Roelke, Shawn Mathwhich, Beth Lind, Randall Gerritson, Matthew Frank, Rick Raemisch, Michael Thurmer, Sandra Hautamaki, Francis Paliekara, Rick Geiger and Lori Simon prohibited plaintiff from praying while at his prison job, in violation of the Free Exercise Clause and the Equal Protection Clause of the United States Constitution, as well as the Religious and Land Use Institutionalized Persons Act; and

> (2) defendants June Kathy Meier, Brenda Rilling, Robert Springborn and Beth Lind conspired to issue a false conduct charges against plaintiff in retaliation for plaintiff's filing of grievances and defendants Hall and Frank refused to take action to overturn the charges.

---

[1] In his complaint, Jackson identified many of the defendants by their last names only. The caption has been amended to reflect the full names as identified by the defendants in their summary judgment submissions.

Defendants' motion for summary judgment is now before the court.  Dkt. #40.[2] That motion will be granted on all claims with the exception of Jackson's retaliation claim against defendants Lind and Meier.  Jackson's claim for affirmative injunctive relief under RLUIPA has been mooted because (1) he no longer works in food services and (2) there is no indication that he will return.  Because monetary damages are not available under RLUIPA, there is no other relief that Jackson can obtain.

With respect to Jackson's Free Exercise claim, defendants are entitled to qualified immunity because Jackson has failed to show that it was clearly established that defendants' policy is unconstitutional.  His Equal Protection claim fails because he has not adduced admissible evidence showing that any of the defendants treated Muslims who wish to pray in food services any differently from adherents of other religions.

Finally, with respect to Jackson's retaliation claim, he has not adduced any evidence that defendants Rilling, Springborn, Hall and Frank took any action because of Jackson's grievances.  Jackson may, however, proceed to trial on his retaliation claim against Meier and Lind because he has raised a genuine issue of material fact regarding whether they were

---

[2]    Defendants filed a motion for summary judgment on January 25, 2010.  One month later, Jackson filed a document called "Plaintiff's Brief in Support of his Cross Motion for Summary Judgment and Response in Opposition to Defendant's Motion for Summary Judgment."  Dkt. #62.  Jackson did not, however, file a separate motion in support of that brief.  After defendants filed their reply materials, Jackson filed a document called "Plaintiff's Reply Brief in Support of His Motion for Summary Judgment."  Dkt. #71.  Defendants filed a motion to strike that document, arguing that it should be considered an unauthorized surreply because Jackson never filed his own motion for summary judgment.  Dkt. #73.  Defendants' motion to strike docket no. 71 will be denied, though it makes little difference here.  The result is the same whether or not the court considers that document.

personally involved in issuing a conduct report to Jackson because of the administrative complaints he filed.

## UNDISPUTED FACTS

The undisputed facts set forth here are taken from defendants' proposed findings of fact and Jackson's responses to those proposed findings. Jackson cites his own proposed findings of fact in his brief, but did not actually file proposed findings with the court. It is not clear whether that was an oversight or intentional. Regardless of the reason for the omission or the relative fault of the parties,[3] the court cannot consider proposed findings of fact that were never filed. In the interest of fairness to a *pro se* litigant, the court has nevertheless reviewed all of the evidentiary materials Jackson filed, including his affidavit, attached documents and affidavits of other prisoners. While the court cannot include this evidence in the undisputed facts (because it is not clear which part of these materials defendants may dispute), the court will discuss any relevant evidence in the context of the opinion.

---

[3]     Defense counsel might have pointed out this omission to Jackson and/or the court before the parties completed briefing. While it is Jackson who is responsible for filing his own summary judgment documents, one would hope parties would point out the other side's obvious procedural oversights while there was time to fix the problem, particularly where one of the parties is indigent and acting *pro se*. Remaining silent hinders not just the opposing party, but also the court, which has a duty to give full consideration to the arguments of both sides and to decide the case on the merits, rather than procedural defects, when possible.

**A. Policy Regarding Prayer in the Kitchen at Waupun Correctional Institution**

Terry Jackson is incarcerated at the Waupun Correctional Institution in Waupun, Wisconsin.   Jackson is a Muslim. On September 19, 2006, he was hired by defendant Joe Hall, the food services manager, to begin working in the kitchen at the prison.  Hall granted Jackson permission to perform salah[4] in the coat room for food services.  (The kitchen does not have an area designated for prisoners to pray.)

Sometime after Jackson began working in the kitchen, defendant Randall Gerritson, a captain at the prison, posted a sign in the kitchen stating that "no inmates [are] allowed to pray in food service."  The sign was posted where only food service workers could see it.

During one of his shifts in October 2006, Jackson was performing salah in the coat room.  When defendant Chris Roelke, a correctional officer, approached, Jackson said Hall had given him permission to pray.  Roelke then said Jackson was not allowed to pray while at work.  Roelke later spoke to defendant Beth Lind, the food services administrator, about Jackson's conduct.   She agreed that Jackson should not be allowed to pray at work. Defendant Lori Simon, a program supervisor, concurred in this decision.

When Lind told Jackson that he could no longer pray in the kitchen, Jackson asked whether he could take time off work until the issue was resolved so that he could pray in his cell.  Lind told Jackson that his only options were to refrain from praying at work or to quit his job.  Jackson continued to work in the kitchen.

---

[4] The parties do not explain in detail what salah entails, but they do not appear to dispute that it is "a five-minute ritual prayer involving bowing and prostration on a prayer rug or its equivalent."  *Aziz v. Le Fevre*, 642 F.2d 1109, 1110 (2d Cir.  1981).

More than 200 prisoners are employed in food services.  At any given time, 60-80 food service workers help produce three meals a day for the approximately 1000 inmates that come to food services to eat each day. To have the meals prepared at the required times, a strict schedule must be maintained for both food production and maintaining and cleaning the facilities.  Prisoners who work in the kitchen do not receive regularly scheduled breaks. Rather, breaks are determined by work flow.

## B.  Jackson's Grievances

On October 31, 2006, Jackson filed a grievance against defendant Roelke, complaining that Roelke had unnecessarily interrupted his prayer.  The inmate complaint examiner recommended that the grievance be dismissed because the examiner found "no information that would support any staff misconduct or work rule violation on the part of staff."  Defendant Michael Thurmer (the warden) and defendant Rick Raemisch (Secretary of the Department of Corrections) affirmed that decision.  Defendant Lind received a copy of the decision.

On November 1, 2006, Jackson filed a second grievance in which he complained generally that he was not allowed to pray at work.  The inmate complaint examiner recommended dismissal because Jackson filed his grievance before asking the chaplain to authorize a new religious practice.  Defendant Raemisch and others affirmed that decision.

## C.  Jackson's Conduct Report

In April 2007, defendant June Kathy Meier, a corrections food service leader, issued a conduct report to Jackson, charging him with battery and engaging in disruptive conduct. The report included the following allegations:

5

> On the above date and time, I June (Kathy) Meier CFSL2 was watching the main serving line with CFSL2 Brenda Rilling with my back to the refrigerated cooler. Inmate Jackson, T 121898 then left his assigned area, walked up to me abruptly in an aggressive manner and while in a bladed stance stated in a loud tone of voice, "Remember what you talked to me about this morning keeping the line moving." He proceeded to move closer to me while forcefully poking me on the right forearm with a rigid finger. He left me no room to move away from him. I directed inmate Jackson to move away from me. At that point inmate Jackson did move back. I instructed inmate Jackson that he is not allowed to touch staff. I immediately informed Sgt. Navis of this incident. Let it be known that inmate Jackson's actions caused numerous inmates to stop working and observe the incident.

Defendant Brenda Rilling, another corrections food service leader, assisted Meier in writing the report.  Defendant Robert Springborn, a correctional officer, was present during the events that gave rise to the conduct report.  Rilling and Springborn did not know about Jackson's previous grievances related to praying at work.  Defendant Lind did not participate in writing the report.

Jackson complained to defendant Hall about the conduct report.  Hall told Jackson that it was never appropriate to touch a staff member and that he would not intervene on Jackson's behalf.  Jackson wrote to defendant Matthew Frank, who was Secretary of the Wisconsin Department of Corrections at the time.  Frank took no action.

After a hearing, Jackson was found guilty of disruptive conduct but not guilty of battery.  The hearing officer wrote:

> I agree that battery is not substantiated in the report as it is written.

> The actions of inmate Jackson obviously drew the attention of others in and around the area.

> The inmate admits coming up to the chef and touching her; he also states that he did not hinder the chef from moving however the conduct report states that Jackson left her no room to move away and that she had to direct the inmate to move away from

6

her.  I also note that both witnesses [prisoners Jeffrey Bland and Jarmal Nelson] state that the chef had to take a step back because of the inmate approaching her.

After reviewing the report, evidence and all of the testimony I find that it is more likely than not that the inmate engaged in actions that disrupted the reasonably orderly environment of the Food Service department in the institution.

As a result of the conduct report, Jackson lost his job in the kitchen and received a sentence of disciplinary separation.  A few months later, Jackson "chose to come back" to work in the kitchen.

Jackson worked in the kitchen from September 2006 to April 2007 and again from January 2008 to January 2009.  (The parties do not explain why plaintiff left his job in January 2009).  Currently, Jackson does not have a work assignment.[5]

## D.  Jackson's Request for a New Religious Practice

In February 2009, Jackson submitted a request for a new religious practice:

I would like to be able to perform my prayer on time as required by Islam when I'm working a job. It doesn't take longer than 5 minutes to perform obligatory prayers. So in the future if I'm put on a job assignment that's not within my cell or room distance, then I would like to be allowed to perform my prayer at work or allowed to go back to my room or to the chapel to fulfill my religious obligation to pray on time. This request is for now and future jobs.

Defendant Francis Paliekara, the prison chaplain, denied the request:

I had a couple of requests of similar nature in October of 2006 and I sought advice from Two (2) Imams, Ronald Beyah and Zakaria Nurdeen who are also currently serving as Chaplains for the Department of Corrections. As per their expert opinion

---

[5]  In his complaint, Jackson alleges that two additional defendants -- Rick Geiger, a food service leader, and Sandra Hautamaki, a program supervisor -- also wrongfully prohibited him from praying at work.  In their summary judgment filings, however, the parties do not discuss any involvement Geiger or Hautamaki may have had.

and recommendation (see the attached copy of email correspondence) which I quote, "Muslim inmates can make up missed prayers when they return back to their unit (after work)" WCI made the decision to deny the request of those two inmates.

The email attachment included the following discussion:

The Islamic prayer is time framed. For example, on November 1, 2006 the morning prayer time begins at 5:12 am and end at 6:31am. Noon prayer begins at 11:39am and end at 2:21pm. Afternoon prayer begin at 2:21pm and end at 4:46pm. Night prayer begins at 6:07pm and ends at 5:13am on 11-01-06. If the inmate has breaks within the time frame of each individual prayer, he or she should have no problem offering the scheduled Islamic prayer.

If the inmates are on a job that requires continuous operation and the break doesn't fall within these time frames per se; the inmate can combine prayers when necessary.

I will make it a point to discuss this issue of prayer during Islamic studies. Islamic inmates can work up missed prayers when they return back to their unit (after work).

The Islamic law on prayer allows this under certain circumstances where the Muslim is not permitted to adhere to his or her religious obligations at the required time. They are therefore not in violation of Islamic requirements for making prayers late.


OPINION

## A.  Prayer in Food Services

### 1.  Scope of Policy at Issue

Jackson argues that he has a right under the Constitution and the Religious Land Use and Institutionalized Persons Act to pray while working in the prison kitchen.  An initial question in this case relates to defining the scope of the "policy" at issue that restricted Jackson's ability to pray.  In their proposed findings of fact, defendants say that Wis. Admin. Code § DOC 309.61 and DAI Policy and Procedure 309.61.01 "indicat[e] that inmates may practice religious services in the chapel, designated institution areas, or in an inmate's cell,"

Dfts.' PFOF ¶36, dkt. #42, and they suggest in their brief that religious activity is prohibited outside those areas, Dfts.' Br., dkt. #41, at 8. But defendants cite to no particular provision in the Division's policies and procedures that prohibits all religious activity outside these areas and the court's own review of the policies uncovered no such prohibition. Further, none of the defendants relied on a particular regulation, practice, procedure or policy when prohibiting Jackson from praying at work.

Thus, the only "policy" at issue appears to be the sign posted by defendant Gerritson in the kitchen area stating that "no inmates [are] allowed to pray in food service." In their proposed finding of fact, however, defendants say that the

> policy does not prevent inmates from praying to themselves while working or during breaks, such as personal meditation. An inmate who is on a brief break because of a slow down in work can personally meditate or pray on the bench in the food services building. The policy also does not prevent inmates from engaging in their own internal religious thoughts or prayers while conducting their work activities.

Dfts.' PFOF ¶38, dkt. #42. As Jackson points out, these exceptions are not stated in the sign that is posted and defendants do not explain whether they are otherwise communicated to the prisoners.

Assuming defendants recognize these exceptions in practice may be beside the point since the parties agree that Jackson was prohibited from performing salah while working in the food service area, even during a "slow" period, at least to the extent that it required him,

(a) to move to a private space, away from the work or bench areas, (b) to lay out a prayer rug, and (c) to prostrate in prayer.[6]

## 2. RLUIPA

In *Nelson v. Miller*, 570 F.3d 868, 883-89 (7th Cir. 2009), the court held that prisoners are not entitled to money damages under RLUIPA, whether or not the claim is brought against a defendant in his official or individual capacity.   Thus, the only relief Jackson could obtain on this claim is an injunction or a declaration, which would be empty indeed given that Jackson no longer works in the kitchen, has not done so since January 2009 (before he even filed this lawsuit), and appears to have no plans to return.

In response to defendants' argument that his RLUIPA claim is moot, plaintiff says that "he will be subject to the application of this unconstitutional policy if he had a job assignment any place in the prison in the future." Plt.'s Br., dkt. #62, at 18.  As discussed above, however, the only "policy" at issue in this case is the one in food services.  Neither side identified a rule or regulation that would prohibit Jackson from praying at another job and this court declines to speculate based on the less than clean rule apparently applied before.  Even if a broader policy did exist, neither side has presented any evidence regarding the feasibility of allowing plaintiff to perform salah anywhere but food services.

---

[6]   A prayer rug is 3 feet by 6 feet. These rugs would need to be searched for contraband, such as weapons.  Large bulky items like prayer rugs are not allowed in the food services building in order to reduce the passing of contraband, while written materials like the Koran or Bible are.

In *Nelson*, the question was whether the prisoner could proceed on a RLUIPA claim that prison officials were refusing to provide him with a religious diet. In concluding that the claim was moot, the court stated that the prisoner

> currently receives a non-meat diet and there is no evidence that [the prison] intends to revoke [the prisoner]'s religious diet. . . . While it is of course theoretically possible that the warden will reverse his decision and . . . .revoke [the prisoner]'s non-meat diet on some other basis, that possibility is supported only by speculation and not evidence.

*Nelson*, 570 F.3d at 882-83.

Here, Jackson has not been employed in the kitchen for more than a year. While Jackson could theoretically end up working there in the future, he does not identify any reason to believe that is likely to happen. In particular, Jackson does not suggest that he left food services in January 2009 because of the prayer restrictions and he asserts no desire to return to work in food services but for those restrictions. Because Jackson continued to work in food services for 18 months after he was prohibited from performing salah, it would be unreasonable to infer without specific evidence that the ban is the reason Jackson no longer works there.

Accordingly, Jackson's RLUIPA claim must be dismissed as moot.

## 3. Free Exercise Clause

Jackson's Free Exercise claim, on the other hand, is not moot to the extent plaintiff seeks damages against defendants in their individual capacities pursuant to 42 U.S.C. § 1983. *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 306-07(1986). A threshold question under the Free Exercise Clause is whether Jackson can show that

defendants substantially burdened his religious exercise. *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989). The court of appeals has described the meaning of "substantial burden" as similar under RLUIPA and the Free Exercise Clause. *Vision Church v. Village of Long Grove*, 468 F.3d 975, 997 (7th Cir. 2006) (stating that meaning of "substantial burden" under RLUIPA "was intended to be interpreted by reference to First Amendment jurisprudence"). Thus, a "substantial burden" is "one that necessarily bears a direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003). *See also Nelson*, 570 F.3d at 878 (applying this test to both First Amendment and RLUIPA claims).

In his brief, Jackson states "[t]here is no dispute" that his religious exercise was substantially burdened by the prohibition on his praying at work. Plt.'s Br., dkt. #62, at 6. Defendants' first argument in their brief, however, is that "[t]here is no evidence that the defendants substantially burdened Jackson's religious exercise." Dfts.' Br., dkt. # 41, at 6. In particular, they argue that Jackson did not suffer a substantial burden because his religion allows him to wait to pray until he is done working: "While there is no dispute that Islamic prayer is time-framed, Muslim inmates can combine prayers when necessary, and in Jackson's situation where he is not permitted to pray at work, he would not be in violation of Islamic requirements for making prayers later after work." *Id.*[7]

---

[7] In the order screening the complaint, the court raised the question whether Jackson's religious exercise would be substantially burdened if he could have transferred to another job where he would be permitted to pray. Dkt. #6, at 5 (citing *Patel v. Bureau of Prisons*, 515 F.3d 807, 815 (8th Cir. 2008) (prisoner's religious exercise not substantially burdened unless he "has exhausted alternative means of accommodating his religious . . . needs")). One might also argue that failing to accommodate a religious request at work does

A problem with that argument is that defendants support this religious doctrine with nothing more than a cite to a document purporting to be an email from two people who defendant Paliekara identifies as imams.  That email is not admissible because it is hearsay and because defendants did not identify Paliekara or the authors of the email as experts in this case.  *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) ("The evidence relied upon in defending a motion for summary judgment must be competent evidence of a type otherwise admissible at trial.").

Even if the email were admissible evidence, or if this court were to otherwise take judicial notice of exceptions to required time-framed, daily prayers recognized by the Muslim faith generally, neither would be dispositive here.  In *Koger v. Bryan*, 523 F.3d 789 (7th Cir. 2008), the court of appeals held that a prisoner does not have to show that a particular religious practice is "compelled by" his religion.  *Id.* at 798 ("[T]o the extent the prison officials' denials of Koger's requests were based on the religiously required test, they unlawfully restricted Koger's religious exercise.").  The question is not whether a restriction places a substantial burden on an average adherent, but whether the *plaintiff* is substantially burdened in practicing his sincerely held beliefs.  *Ortiz v. Downey*,  561 F.3d 664, 669 (7th Cir. 2009) ("A person's religious beliefs are personal to that individual; they are not subject to restriction by the personal theological views of another.")

In this case, Jackson avers the following in his affidavit:

---

not create a substantial burden if the prisoner has a choice whether to work at all.  Because the parties do not discuss these questions, however, the court will not address them.

I am a practicing devout Muslim and on[e] of the tenets of Islamic [religion] is the performance of "Salah" which entails (5) Daily Prayers, which consist of Fajr (dawn prayer), Dhuhr (noon prayer), Asr (afternoon prayer), Maghrib (sunset prayer), Isha (night prayer). These prayers cannot transgress each other and must be completed before the next prayer in order to be received.

It is my personal belief that by not performing such daily prayers on time, it is a major sin in Islam.

Plt.'s Aff. ¶¶ 1-2, dkt. #59. This is enough at the summary judgment stage to show a substantial burden on this particular plaintiff's religious exercise -- performing salah at specific times.

The next question under the Free Exercise clause is whether the prohibition on prayer is "a neutral [rule] of general applicability." *Employment Division Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 887 (1990).[8]  Defendants point to the fact that the restrictions on prayer in the service area applies the same to all religions. Even if true, that is not the test. Under *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993), a rule is not generally applicable if it "imposes burdens only on conduct motivated by religious belief" in a "selective manner." In this case, the policy at issue prohibits prayer only, and apparently only certain kinds of prayer, which is certainly a burden on "conduct motivated by religious belief."

---

[8] In *Sasnett v. Litscher*, 197 F.3d 290 (7th Cir. 1999), the court of appeals questioned whether *Smith* applies to prisoner claims, but the *Koger* court seemed to assume that it did, without addressing *Sasnett*. *Koger*, 523 F.3d at 796. *See also Boles v. Neet*, 486 F.3d 1177, 1182 (10th Cir. 2007) (noting different views held among the circuits on this question). The court assumes that *Smith* applies for purposes of its analysis both because the parties' do so and because it will not change the outcome of the case.

The final question is whether the policy is reasonably related to a legitimate penological interest. *Turner v. Safley*, 482 U.S. 78, 89 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.").  Answering that question requires consideration of four factors: (1) whether the restriction is rationally related to a legitimate and neutral governmental objective; (2) whether there are alternative means of exercising the right that remain open to the inmate; (3) what impact an accommodation of the asserted right will have on guards and other inmates; and (4) whether there are obvious alternatives to the restriction that show that it is an exaggerated response to penological concerns.  *Ortiz v. Downey*, 561 F.3d 664, 669 (7th Cir. 2009) (applying *Turner* standard in case brought under Free Exercise Clause).  Both the Supreme Court and the Court of Appeals for the Seventh Circuit have repeatedly emphasized the deference that courts must afford prison officials in applying this standard.  *Beard v. Banks*, 548 U.S. 521, 535 (2006) (criticizing lower court for "offer[ing] too little deference to the judgment of prison officials"); *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them");*Westefer v. Snyder*, 422 F.3d 570, 575 (7th Cir. 2005) ("The decision of prison administrators as to the detrimental effect of [a prohibited practice] is a decision to which we owe great deference.").

To some extent, the second factor (whether Jackson has alternatives to exercising his right) overlaps with the question whether Jackson's religious exercise has been substantially

15

burdened.  Plaintiff has shown that he did not have an alternative way of performing salah in a timely manner while he was working in the kitchen.  (Again, the record is not clear whether Jackson could have chosen another job where he would have been allowed to pray.) The Supreme Court has been reluctant, however, to apply the second factor simply by asking whether a prisoner has the ability  to engage in the particular religious exercise at issue.  For example, in *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987), Muslim prisoners were challenging a prison work policy that required them to miss Jumu'ah services on Fridays. The Court agreed with the prisoners that they had "no alternative means of attending Jumu'ah," but noted that "the very stringent requirements as to the time at which Jumu'ah may be held may make it extraordinarily difficult for prison officials to assure that every Muslim prisoner is able to attend that service." *Id.* at 351.  The Court found it sufficient that the prisoners were "not deprived of all forms of religious exercise, but instead freely observe a number of their religious obligations."  *Id.* at 352.  In this case, it is undisputed that Jackson had many opportunities for prayer in the manner and times he believed compelled by his religion when he was not working in the kitchen and apparently, for less personal, demonstrative prayer at unscheduled times while working.

With respect to the first factor, defendants provide a list of reasons for the "no prayer" rule.  They say that allowing Jackson and other prisoners to pray at scheduled times, privately or prostrate in the kitchen would: (a) disrupt food production because prisoners who work in food services do not receive regularly scheduled breaks; (b) require additional monitoring of prisoners who leave the kitchen to pray; (c) create a risk that the individual praying would be harassed or even assaulted by other prisoners; and (d) require additional

16

screening of property needed to engage in prayer rituals, such as a prayer rug. These interests in maintaining security and preserving resources are legitimate interests, similar to those upheld in past cases. *O'Lone*, 482 U.S. at 350-51 (requiring prisoners to work outside prison is rational even if it results in Muslim prisoner missing Jumu'ah services because work program helps alleviate drain on prison resources and teaches prisoners real life work skills); *Kaufman v. McCaughtry*, 419 F.3d 678, 683 (7th Cir. 2005) (no free exercise violation by denying request for religious study group because "defendants submitted an affidavit stating that allowing any group of inmates to congregate for a meeting raises security concerns and requires staff members to supervise the group"); *Tarpley v. Allen County, Indiana*, 312 F.3d 895, 898 (7th Cir. 2002) (upholding policy that prohibited prisoners from possessing a personal Bible because of "interest in maintaining safe conditions and in preventing later disputes over lost or damaged items"); *Jihad v. Fabian*, 680 F. Supp. 2d 1021, 1027 (D. Minn. 2010) (religious rights of Muslim prisoners not violated by refusing to allow them to leave their cell five times a day for prayer; deferring to judgment of prison officials that "the safety of prison inmates and staff would be jeopardized by the increased movement of prisoners if inmates were allowed to leave their cells five times a day to pray").

Jackson argues that each of defendants' concerns is irrational or could be fully addressed with a less severe restriction. With respect to defendants' concern about disrupting food production, Jackson avers that prisoners in the kitchen are idle for more than half of their shift, leaving plenty of time for prayer during these "down times." Jackson Aff. ¶ 84, dkt. #59. Defendants cite no contrary evidence. However, neither side adduced evidence regarding the predictability of the "down times" or how long they usually last, so

it is not clear whether permitting Jackson to pray during slow periods would be sufficient to ensure that Jackson could pray at the required time.

With respect to defendants' alleged inability to supervise prayer outside the kitchen, Jackson avers that there are areas in or near food services, such as the coat room and the cafeteria, that are monitored by cameras at all times. Plt.'s Aff. ¶ 83, dkt. #59. Security cameras do not necessarily provide the same level of supervision as a staff member, so Jackson's suggestion is not necessarily persuasive. But Jackson also argues that any interest in "constant monitoring" is disingenuous. He avers that large groups of workers are left alone in the coat room for five to fifteen minutes each shift while they are changing into their clothes. Jackson Aff. ¶ 95, dkt. #59. While it begs credulity that the prison allows groups of prisoners into the coat room unsupervised for periods of time, that kind of inconsistency would call defendants' stated security concern into question. *Cf. George v. Smith*, 507 F.3d 605 (7th Cir. 2007) ("A prison could not invoke security as a reason to exclude publications that prisoners may read in the library, and which they may copy out for use in their cells."); *Sasnett v. Litscher*, 197 F.3d 290, 292-93 (7th Cir. 1999)(prison officials could not justify ban on wearing crucifixes on security grounds when wearing rosaries was already permitted), *overruled on other grounds by Bridges v. Gilbert*, 557 F.3d 541 (7th Cir. 2009).

Even crediting Jackson's averment , a prison may view the risks of collective activities differently than it would allowing individual prisoners to wander off to pray alone as proposed here. In any event, allowing one potential security breach does not necessarily require another one. In some cases, the court of appeals has stated that *Turner* requires

courts to defer to prison official's judgment on security issues, even when inconsistencies exist. *See, e.g., Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009) ("Mays's only argument that the prison's censorship was unreasonable is that he had access to other writings and to television shows about prison riots, but the deference we afford prisons permits such seeming inconsistences.").

With respect to defendants' third concern, potential harassment of the prisoners praying, Jackson says that defendants have failed to point to any instances in the past in which prisoners were victimized because of prayer. This would be a winning argument under RLUIPA or the Religious Freedom Restoration Act,[9] which place the burden on prison officials the restriction furthers "a compelling governmental interest," and does so by "the least restrictive means." *Cutter v. Wilkinson*, 544 U.S. 709, 712 (2005); *U.S. v. Israel*, 317 F.3d 768, 770 (7th Cir. 2003). Defendants' argument is similar to the one raised by the defendants in *O'Bryan v. Bureau of Prisons*, 349 F.3d 399, 401 (7th Cir. 2003), a RFRA case in which prison officials justified a ban on Wiccan spell-casting on the ground that, "[i]f an inmate were to cast a spell on another inmate . . . and the other inmate were to find out about it, a fight or other serious disruption could easily occur." The Seventh Circuit rejected that argument:

> [R]elying on other inmates' reactions to a religious practice is a form of hecklers' veto. The RFRA does not allow governments to defeat claims so

---

[9] The Religious Freedom Restoration Act, or RFRA, is a precursor to RLUIPA. The Supreme Court declared the RLUIPA unconstitutional as it applies to the states. *City of Boerne v. Flores*, 521 U.S. 507 (1997). Case law interpreting that act is relevant in RLUIPA cases because the two statutes apply the same standard of review with respect to restrictions on the religious rights of prisoners. *E.g., Nelson v. Miller*, 570 F.3d 868, 886 (7th Cir. 2009).

easily. A governmental body that imposes a "substantial" burden on a religious practice must demonstrate, and not just assert, that the rule at issue is the least restrictive means of achieving a compelling governmental interest.

*Id*.

Under *Turner*, however, prison officials do not have to rely on past problems to justify a rule. Rather, they are entitled to "anticipate security problems" before they occur. *Turner*, 482 U.S. at 89. For example, in *Singer v. Raemisch*, 593 F.3d 529 (7th Cir. 2010), the court considered a ban on role playing games and related publications. Prison officials justified the ban in part because role playing games "can mimic the organization of gangs and lead to [their] actual development." *Id*. at 535. While the defendants failed to point to a single example in which a role playing game had let to a security problem, the court rejected the plaintiff's argument that such evidence was required. *Id*. at 536. It was enough in *Singer* that the defendants had provided "a plausible explanation" for the ban. *Id*.

Jackson bolsters his argument with another showing of potential inconsistency. He points out that there is no restriction on prisoners praying in their cells, even when their cell mate does not share the same religion. In addition, defendants admit that praying in the cafeteria is not prohibited, an even more public setting than food services. Defendants do not explain these inconsistencies in their brief or proposed findings of fact.

With respect to defendants' concern about the potential for prayer rugs to be used to smuggle contraband, Jackson says that the rugs would not need to be carried in and out of food services because prisoners could store it there. He avers that the workers have (1) a "religious drawer" where they store other religious items and (2) a "property box" where they keep their clothes after changing into their work uniform. Plt.'s Aff. ¶ 88, dkt. #59.

While citing no contrary evidence, defendants argue that Jackson has not shown "that storing inmate religious property in . . . personal storage space at Food Services is a viable option" and they suggest without further explanation that security concerns would remain even if the rug were stored on site.  Dfts.' Reply to Plt.'s Resp. to Dfts.' PFOF ¶ 69, dkt. #67.

Facially, Jackson has raised a genuine issue of material fact regarding whether the "no prayer" rule violates his rights under the Free Exercise Clause.  Jackson must do more, however, to defeat defendants' motion for summary judgment on this claim.  Because defendants have raised a qualified immunity defense, he must show that it was clearly established in the law that prohibiting him from praying in kitchen violated the Free Exercise Clause. *Mannoia v. Farrow*, 476 F.3d 453, 457 (7th Cir. 2007); *Alexander v. City of Milwaukee*, 474 F.3d 437, 446 (7th Cir. 2007).  This means that Jackson must point to a Supreme Court case, a case from the Seventh Circuit or "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999). Alternatively, Jackson may show that "a general constitutional rule already identified [applies] with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Michael C. v. Gresbach*, 526 F.3d 1008, 1017 (7th Cir. 2008).  As the previous discussion suggests, this is a burden Jackson cannot meet.

Jackson cites nothing from the Supreme Court or the Seventh Circuit to show that defendants should have known that they were acting unlawfully.  There are some cases that provide support for his claim, but none address the issues raised in this case or establish a

general rule that applies with "obvious clarity." Particularly because *Turner* requires prison officials to weigh several different factors, it is difficult to argue that a policy "clearly"violates that standard unless a previous case is on point or the prison officials have no justification for the policy.

Jackson cites *McEachin v. McGuinnis*, 357 F.3d 197, 204-05 (2d Cir. 2004), *Mayweathers v. Newland*, 258 F.3d 930 (9th Cir. 2001), and *Omar v. Casterline*, 288 F. Supp. 2d 775, 781 (W.D. La. 2003), but these cannot carry the day for him. In *McEachin*, the court simply determined that the prisoner had stated a claim under the Free Exercise Clause by alleging that "he was disciplined for failing to obey an order expressly given to him by a corrections officer who knew that completion of the task would require plaintiff to abandon religious prayers." That is factually distinguishable from this case because Jackson was never punished for praying.[10] *McEachin* is procedurally distinguishable as well because the court did not determine that the defendants had violated the prisoner's rights, only that he had stated a claim. The court emphasized it could not determine at the pleading stage whether the defendants' actions were reasonably related to a legitimate, penological interest. *Id.* at 205 n.8

In *Omar*, F. Supp. 2d at 781, the plaintiff's claim was that he was "repeatedly given pork and pork products" despite requests for a halal diet and that that defendants "would not tell him the time of day in order to follow his prayer schedule." The court stated that it was "unable to conceive of any 'penological interest' to justify serving Omar pork or

---

[10]  Jackson also alleges that defendants gave him a conduct report in retaliation for complaining about being unable to pray, but that claim is addressed elsewhere.

refusing to tell him the time of day for prayers" and the defendants did not provide one. *Id.* That is in sharp contrast to this case, in which the defendants have articulated several legitimate interests for the restriction, even if some of them are not adequately justified.

In *Mayweathers*, 258 F.3d at 938, the Court of Appeals for the Ninth Circuit concluded that officials had violated the free exercise rights of prisoners by punishing inmates for missing work to attend Jumu'ah services. *Mayweathers* is arguably inconsistent with *O'Lone*, in which the Supreme Court came to the opposite conclusion in a case raising similar issues. In addition, the court in *Mayweathers* applied the *Turner* standard incorrectly by placing the burden on the prison officials to show that accommodating the right would not have an adverse impact on prison security or resources.

Even if one assumed that *Mayweathers* was decided correctly, it is but one decision from another circuit addressing different issues. Thus, that case alone cannot constitute "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful" or that "a general constitutional rule already identified [applies] with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." Accordingly, defendants' motion for summary judgment must be granted with respect to Jackson's § 1983 claim.

## 4. Equal Protection Clause

To prevail on his equal protection claim, Jackson must show that defendants refused to allow him to pray in private, at a time of his choosing and prostrate because he is a Muslim, rather than because they believe such prayer during work hours is disruptive and

23

creates a security risk. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948-49 (2009) ("Where the claim is invidious discrimination . . . our decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose" and that defendant "undert[ook] a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group."). *See also Goodvine v. Swiekatowski*, No. 08-cv-702-bbc, 2010 WL 55848, *3 (W.D. Wis. Jan. 5, 2010) ("[T]he test for a claim of religious discrimination claim is the same whether it is analyzed under the equal protection clause or the establishment clause: was the defendant treating members of some religious faiths more favorably without a secular reason for doing so?").

> In his affidavit, Jackson cites the following evidence of discrimination:

> I attest to the fact that I personally knew other inmates that worked in food services during and before I begin working, that I witness and or told me they prayed in the kitchen all the time and never had any issues with staff who seen them bowing their head and clasping their hands during prayer. A few of those inmates I seen and told me they prayed with no issue from staff who seen me pray before are Jarmal Nelson and Jeffrey Bland.

Jackson Aff. ¶80, dkt. #59.

This passage from Jackson's affidavit fails to prove his claim for several reasons. First, to the extent Jackson is relying on what other prisoners *told* him, that evidence is inadmissible under the federal rules because Jackson does not have personal knowledge of the underlying events. Fed. R. Civ. P. 56(e)(1) ("A supporting or opposing affidavit must be made on personal knowledge."). Second, Jackson's personal observations do not show that *defendants* saw and approved others praying, choosing intentionally to discriminate against him because of his religion. Even if some of those inmate seen in prayer are not

24

Muslims, Jackson cannot prove intentional discrimination unless one or more *defendants* were aware that similarly-situated, non-Muslim prisoners were allowed breaks to pray in private spaces during their food service work hours *and* allowed those non-Muslim prisoners to continue praying.   Jackson's affidavit is so vague that he fails to identify the prison staff involved or provide any other details about an instance of favorable treatment toward other prisoners, much less specifics as to conduct involving a named defendant.  Fed. R. Civ. P. 56(e)(2) (party opposing summary judgment must "set out specific facts" supporting his position).

In addition to his own affidavit, Jackson has submitted the affidavits of several other prisoners, but none of this testimony supports Jackson's claim.  For example, inmate Jeffrey Bland testifies that he "prayed over [his] food in the cafeteria before eating it" in the presence of prison staff.  Dkt. #64, at ¶5.  *See also* Nelson Aff. ¶ 5, dkt. #63 (stating that he "prayed over [his] food in the cafeteria").  That testimony does not help Jackson because the rule at issue does not prohibit prisoners from praying before they eat in the cafeteria; it prohibits them from praying during work hours in the kitchen.  Nor does Jackson argue that he was prohibited from saying a prayer before he ate, so Bland's affidavit is not probative of discrimination.

Worse, for plaintiff's equal protection claims, inmate Terez Cook avers that staff did not stop him from saying *Muslim* prayers while he was working in the kitchen.  Dkt. #66, at ¶¶ 1-3.  If true, it undermines Jackson's claim that defendants discriminated against him because of his status as a Muslim.  At most, it would suggest that some prisoners were able

to pray without some staff realizing it or, more likely, that prisoners were allowed to pray where they worked or in the bench area during slow periods.

Of the four prisoner affidavits Jackson submitted, only one identifies a particular staff member. Tingia Wheeler testified he worked in the kitchen at the Waupun prison at the same time that Jackson did and avers that defendant Thurmer stated in a letter that Wheeler "could perform [his] prayer as long as it did not interfere with his job." Dkt. #65, at ¶¶ 1-2. While Jackson does not discuss this affidavit in his brief, presumably his intent is to show that defendant Thurmer treated him less favorably than Wheeler. A procedural problem is that Wheeler does not attach a copy of the letter as required by the federal rules. Fed. R. Civ. P. 56(e)(1) ("If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit.") Even if Wheeler's affidavit were admissible, he does not identify to which religion he belonged, leaving the court to wholly speculate that Thurmer was preferring one religion over another. Finally, Thurmer had no involvement in the decision to prohibit prayer in the kitchen.

The parties agree that defendant Gerritson initiated the rule, such as it was, not Thurmer. It is not clear whether Thurmer even knew about it. While Thurmer affirmed the dismissal of a grievance that Jackson filed against defendant Roelke for stopping Jackson from praying at work, the only issue the inmate complaint examiner considered was whether Roelke engaged in "staff misconduct or work rule violations." A reasonable jury could not infer from this affirmance and Wheeler's affidavit that Thurmer was intentionally discriminating against Jackson on the basis of religion any more than food manager Hall's permission to Jackson's praying in a coat room meant that the institution was intentionally

26

discriminatory when a correctional officer ultimately enforced a prison captain's posted prohibition against inmate's praying while working as a food server.

## B.  Retaliation

Jackson's final claim is that defendants Meier, Rilling, Springborn, Hall, Lind and Frank conspired to retaliate against Jackson by issuing a false conduct report against him and then refusing to overturn it because he complained about being unable to pray at work.  As was explained in the screening order, prison officials may not retaliate against a prisoner for exercising a constitutional right, *Pearson v. Welborn*, 471 F.3d 732, 738 (7th Cir. 2006), which includes the right to complain about prison conditions under the free speech clause of the First Amendment, *Bridges v. Gilbert*, 557 F.3d 541, 551 (7th Cir. 2009), and to file grievances under the petition clause.  *Powers v. Snyder*, 484 F.3d 929, 932 (7th Cir. 2007). Jackson has the burden to prove that his grievances were a "substantial or motivating factor" in defendants' behavior.  *Mt. Healthy Board of Education v. Doyle*, 429 U.S. 274, 287 (1977); *Johnson v. Kingston*, 292 F. Supp. 2d 1146, 1153-54 (W.D. Wis. 2003).

Defendants do not deny that Jackson's grievances may be protected by the Constitution.  The question is whether Jackson has adduced sufficient evidence to show that defendants retaliated against him because he filed those grievances.  Relevant to that question is Jackson's motion for leave to file the affidavit of Jerome Long, a prisoner who worked in the kitchen around the same time as Jackson. Dkt. #75.  Defendants oppose the motion on the ground that Jackson did not file the affidavit until well after the deadline for filing summary judgment materials, but Jackson explains in his motion that he was unaware Long had knowledge relevant to his claim until recently, when Jackson was moved to a cell

near Long.  Defendants say that Jackson has only himself to blame for failing to locate Long earlier because Jackson could have written other prison workers to determine whether they had relevant information.  However, it is undisputed that more than 200 prisoners are employed in food services.  It would not be realistic to expect a pro se prisoner to attempt to learn the names and locations of the hundreds of prisoners who worked in the kitchen during the same time he did (more than 18 months) and then contact each one of them to ask them about his case.  To the extent defendants believe they are prejudiced by the late submission, the court will grant them leave to depose Long before trial, if defendants wish to do so, and provide relief from the current trial date to accomplish it.

Turning to the substance of Long's affidavit, he avers that he worked in food services from November 2006 to February 2007.  In February 2007, he overheard a morning meeting between defendants Lind, Meier, Simon and Geiger.  Lind told the other staff members to "keep an eye on inmate Terry Jackson, and if you catch him praying or anything else you can find, write him a conduct report for disobeying orders."  A few days later, Long heard defendant Roelke tell defendant Meier that Jackson "is harassing staff with inmate complaints about not being allowed to pray" and that "if she catches him praying in the Food Services or making the slightest mistake in the performance of his job," she should "write him a conduct report because he doesn't need to be working in Food Services."  Long Aff. ¶¶ 5-6, dkt. #77.

Long's testimony is sufficient to raise a genuine issue of material fact regarding whether defendant Meier issued the conduct report to Jackson because of the grievance he filed.  (Jackson did not assert a retaliation claim against Roelke.).  According to Long, Meier

28

received instructions to write Jackson up if he made "the slightest mistake" because he had

been "harassing staff with inmate complaints."  A few weeks later, Meier charged Jackson

with battery and engaging in disruptive conduct.  This is strong circumstantial evidence of

a retaliatory motive.  Disparaging comments made about a plaintiff's protected conduct

followed shortly by adverse treatment is sufficient evidence to defeat defendants' motion for

summary judgment as to Meier. *Magyar v. Saint Joseph Regional Medical Center*, 544 F.3d 766,

773 (7th Cir. 2008) (concluding that summary judgment was inappropriate on retaliation

claim because of evidence that defendant was bothered by defendant's protected conduct);

*Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 793 (7th Cir. 2007) ("The causal link of

a retaliation claim is frequently established by showing that there was a suspiciously short

period of time between the . . . complaint and the adverse . . . action.").  Although Meier did

not make disparaging comments herself, one reasonable inference that may be drawn from

her silence is that she agreed with Roelke and intended to follow his instructions. Because

Long's affidavit is sufficient by itself to create a genuine issue of material fact, Jackson's

other evidence with respect to Meier need not be considered.

Jackson does admit tapping Meier's arm and the hearing officer ultimately found

Jackson guilty of disruptive conduct, though not of the battery charge.  Even if Jackson

violated a prison rule, however, his retaliation claim survives *if* his violation of the rules

would have been overlooked had he not filed a grievance. *Crawford-El v. Britton,* 523 U.S.

574, 594 (1998) (in First Amendment retaliation case, rejecting "proposal to immunize all

officials whose conduct is 'objectively valid,' regardless of improper intent");  *Howland v.*

*Kilquist*, 833 F.2d 639, 644 (7th Cir. 1987) ("It is well established that an act in retaliation

for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for different reasons, would have been proper."). In light of evidence that Meier was "looking" for reasons to discipline Jackson, a jury will have to decide which version of the story is more credible.

Further, because it is clearly established that prison officials may not retaliate against prisoners for filing grievances, defendant Meier is not entitled to qualified immunity at this stage. *Babcock v. White*, 102 F.3d 267, 276 (7th Cir. 1996) ("[F]ederal courts have long recognized a prisoner's right to seek administrative or judicial remedy of conditions of confinement."); *Pearson v. Welborn*, 471 F.3d 732, 742 (7th Cir. 2006) ("[A] reasonable public official in Welborn's position would understand that retaliating against a prisoner on the basis of his complaints about prison conditions is unlawful.")

Jackson's claim as to defendant Lind is a closer call. Long avers that Lind told her staff, including defendant Meier, to give Jackson a conduct report for "anything . . . you can find." That statement certainly supports a belief that Lind was "out to get" Jackson, though Long does not aver that she explicitly mentioned Jackson's grievances.

Taken as a whole, Jackson has adduced enough evidence to present his retaliation claim against Lind to a jury as well. Defendant Lind knew about at least one of Jackson's grievances because she had received a copy of the decision rejecting it; Lind had reason to be bothered by the grievance because she was enforcing the "no prayer" rule in the kitchen and had spoken to Jackson about it; and the record does not disclose any reason other than Jackson's complaints motivating Lind to want the kitchen staff to be more severe with Jackson than any other food service worker. While Lind was not personally involved in

30

*writing* the report, she may be held liable on these facts for directing her staff to take a retaliatory action in violation of § 1983. *Nanda v. Moss*, 412 F.3d 836, 842 (7th Cir. 2005) ("Under § 1983, supervisory liability can be established if the conduct causing the constitutional deprivation occurs at the supervisor's direction or with the supervisor's knowledge and consent.")

This leaves defendants Rilling, Springborn, Hall and Frank .  Defendants Rilling and Springborn deny that they even knew Jackson had filed grievances about being unable to pray. In his responses to defendants' proposed findings of fact, Jackson does not dispute that Rilling and Springborn were unaware of his grievances.  Plt.'s Resp. to Dfts.' PFOF ¶¶113 and 117, dkt. #58.  Thus, Jackson cannot prevail on his retaliation claim against Springborn and Rillings.  *Morfin v. City of East Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003) ("The protected conduct cannot be proven to motivate retaliation if there is no evidence that the defendants knew of the protected activity.")

The factual record for Jackson's claim against defendants Hall and Frank is also weak. Hall and Frank did not issue or even affirm the conduct report.  Jackson's only allegation against them is that they refused to intervene on his behalf.  It appears that Frank failed to respond to a letter in which Jackson complained about the disciplinary decision, but Frank had no constitutional obligation to intervene under those circumstances. *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("Public officials do not have a free-floating obligation to put things to rights.")

As the court explained in the screening order, a plaintiff must show that a supervisory official shared the employee's retaliatory motive to prevail against the supervisor for failing

to correct another employee's alleged retaliation. *Iqbal*, 129 S. Ct at 1949 ("[P]urpose rather than knowledge is required to impose . . . liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities."). *See also Wilson v. Greetan*, 571 F. Supp. 2d 948, 966 (W.D. Wis. 2007) (hearing officer may not be held liable for retaliatory conduct report if plaintiff fails to show that hearing officer shared animus held by officer who wrote report). A reasonable jury could not infer that Frank had a retaliatory motive simply because he failed to act on Jackson's letter.

With respect to Hall, it is not clear whether he had any authority to help Jackson overturn the conduct report, even if he wanted to do so. In any event, it makes no sense to suggest that Hall refused aid because Jackson had filed grievances about being unable to pray. After all, it was Hall who initially gave Jackson permission to pray in the kitchen. Jackson identifies no reason to disbelieve Hall's explanation that he refused to help because he thought that Jackson had acted improperly by touching Meier.

## C. Trial

Trial is currently scheduled for July 19, 2010. Because both sides may need more time to prepare in light of Jackson's new witness, the court will push back the trial date to September 7, 2010.

ORDER

IT IS ORDERED that

1.      Plaintiff's motion for leave to file the affidavit of Jerome Long, dkt. #75, is
        GRANTED.

2.      The motion for summary judgment filed by defendants, dkt. #40, is DENIED
        with respect to plaintiff's claim that defendants June Kathy Meier and Beth
        Lind retaliated against him for filing grievances; the motion is GRANTED in
        all other respects.

3.      Defendants' motion to strike, dkt. #73, is DENIED as moot.

4.      The July 19, 2010 trial date and all pretrial deadlines are STRICKEN.  The
        new date for the final pretrial conference and the trial is September 7, 2010.

Entered this 21st day of June, 2010.

                        BY THE COURT:

                        /s/

                        _____

                        WILLIAM M. CONLEY
                        District Judge